No. 17-1398

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COMPUTER SCIENCES CORPORATION,

Plaintiff-Appellant,

v.

FEDERAL HOME LOAN MORTGAGE CORPORATION
D/B/A FREDDIE MAC,

Defendant-Appellee.

On Appeal from the United States District Court
for the Eastern District of Virginia

## PUBLIC APPELLANT'S BRIEF

Steve Sumner
David Schick
Justin Sumner
Gayle Boone
SUMNER SCHICK & PACE LLP
3811 Turtle Creek Blvd., Suite 600
Dallas, TX 75219
(214) 965-9229
ssumner@sumnerschick.com
dschick@sumnerschick.com
jsumner@sumnerschick.com
gboone@sumnerschick.com

William S. Consovoy
Bryan K. Weir
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Suite 70
Arlington, VA 22201
(703) 243-9423
will@consovoymccarthy.com
bryan@consovoymccarthy.com

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Per Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Appellant

Computer Sciences Corporation makes the following disclosures:

1.      Appellant is not a publicly held entity.

2.      Appellant has a parent corporation: DXC Technology.

3.      No publicly held entity owns 10% or more of appellant's stock.

4.      No other publicly held entity has a direct financial interest in the outcome of this litigation.

5.      Appellant is not a trade association.

6.      This case does not arise out of a bankruptcy proceeding.

May 22, 2017                                    /s/ William S. Consovoy
                                                Counsel for Appellant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF CASE .................................................................... 1

SUMMARY OF ARGUMENT ........................................................... 15

STANDARD OF REVIEW ................................................................ 18

ARGUMENT ..................................................................................... 19

   I.    The district court should have denied summary judgment on the
       claim for breach of contract .................................................... 20

      A.    Invoice 1 presents a genuine dispute of material fact ............................. 20

      B.    Invoices 25 and 34-52 present genuine disputes of material fact ........... 24

      C.    The transition costs present a genuine dispute of material fact. ............ 32

      D.    The early termination fees and wind-down expenses present genuine
         disputes of material fact ................................................................. 33

   II.   The district court should have denied summary judgment on the
       claim for breach of the implied covenant of good faith and fair dealing ..... 43

CONCLUSION .................................................................................. 50

CERTIFICATE OF COMPLIANCE .................................................. 52

CERTIFICATE OF SERVICE ........................................................... 53

# TABLE OF AUTHORITIES

## Cases

*ADC Orange, Inc. v. Coyote Acres, Inc.,*
  857 N.E.2d 513 (N.Y. 2006) ............................................................... 25

*African Diaspora Mar. Corp. v. Golden Gate Yacht Club,*
  968 N.Y.S.2d 459 (App. Div. 2013) ............................................ 43, 49

*Am. Hardware Mut. Ins. Co. v. BIM, Inc.,*
  885 F.2d 132 (4th Cir. 1989) ............................................................. 31

*Am. Metal Forming Corp. v. Pittman,*
  52 F.3d 504 (4th Cir. 1995) ............................................................... 19

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................ 18, 19, 35

*Arc Elec. Const. Co. v. George A. Fuller Co.,*
  247 N.E.2d 111 (N.Y. 1969) .............................................................. 25

*B. Reitman Blacktop, Inc. v. Missirlian,*
  860 N.Y.S.2d 211 (App. Div. 2008) ................................................... 28

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.,*
  821 F.3d 297 (2d Cir. 2016) ............................................................... 42

*Bresler v. Wilmington Trust Co.,*
  855 F.3d 178 (4th Cir. 2017) ............................................................. 40

*Broin & Assocs., Inc. v. Genencor Int'l, Inc.,*
  232 F.R.D. 335 (D.S.D. 2005) ........................................................... 50

*Campbell v. Hewitt, Coleman & Assocs., Inc.,*
  21 F.3d 52 (4th Cir. 1994) ................................................................. 18

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.,*
  930 F.2d 228 (2d Cir. 1991) ............................................................... 44

*CBS, Inc. v. Merrick*,
   716 F.2d 1292 (9th Cir. 1983) ................................................................ 28

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................. 22

*CIBC Bank & Trust Co. (Cayman) v. Banco Cent. do Brasil*,
   886 F. Supp. 1105 (S.D.N.Y. 1995) ...................................................... 26

*Cohen v. Kranz*,
   189 N.E.2d 473 (N.Y. 1963) .................................................................. 26

*Columbia Union Coll. v. Clarke*,
   159 F.3d 151 (4th Cir. 1998) ................................................................. 35

*Credit Agricole Corp. v. BDC Fin., LLC*,
   22 N.Y.S.3d 847 (App. Div. 2016) ........................................................ 46

*DeLago v. Robert Plan Corp.*,
   No. 04-cv-3193, 2006 WL 489845 (S.D.N.Y. Feb. 28, 2006) ................. 31

*Design Partners, Inc. v. Five Star Elec. Corp.*,
   No. 12-cv-2949, 2017 WL 818364 (E.D.N.Y. Mar. 1, 2017) ................... 45

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ............................................................ 37, 38

*DiStefano v. Maclay*,
   102 F. App'x 188 (2d Cir. 2004) ........................................................... 32

*Dunning v. Bush*,
   536 F.3d 879 (8th Cir. 2008) ................................................................. 41

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ................................................................. 39

*Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*,
   264 F.3d 424 (4th Cir. 2001) ........................................................... 19, 35

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*,
   949 N.Y.S.2d 115 (App. Div. 2012) ...................................................... 43

*Fishoff v. Coty Inc.*,
    634 F.3d 647 (2d Cir. 2011) ........................................................ 43

*Fortress Re, Inc. v. Cent. Nat. Ins. Co. of Omaha*,
    766 F.2d 163 (4th Cir. 1985) ...................................................... 27

*Friedman v. Maspeth Fed. Loan & Sav. Ass'n*,
    30 F. Supp. 3d 183 (E.D.N.Y. 2014) ........................................ 46

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
    721 F.3d 264 (4th Cir. 2013) (en banc) .................................... 15

*Guessous v. Fairview Prop. Invs., LLC*,
    828 F.3d 208 (4th Cir. 2016) ...................................................... 19

*Gutierrez v. Gov't Emps. Ins. Co.*,
    25 N.Y.S.3d 625 (App. Div. 2016) ...................................... 43, 46

*Henry v. Purnell*,
    652 F.3d 524 (4th Cir. 2011) (en banc) .................................... 18

*Hong Leong Fin. Ltd. (Singapore) v. Stanley*,
    13 N.Y.S.3d 832 (App. Div. 2015) ............................................ 46

*Hughes v. Stottlemyre*,
    454 F.3d 791 (8th Cir. 2006) ...................................................... 22

*In re Montagne*,
    No. 08-10916, 2010 WL 1780411 (Bankr. D. Vt. May 4, 2010) ................................ 50

*Jacobs v. N.C. Admin. Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015) ...................................................... 18

*JJM Delta Dallas Alpha Corp. v. S. St. Seaport Ltd. P'ship*,
    4 N.Y.S.3d 510 (App. Div. 2015) .............................................. 46

*JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., Inc.*,
    997 N.Y.S.2d 270 (Sup. Ct. 2014) ............................................ 45

*John Deere Co. v. Am. Nat. Bank,*
  809 F.2d 1190 (5th Cir. 1987) ............................................................. 22

*John St. Leasehold LLC v. FDIC,*
  196 F.3d 379 (2d Cir. 1999) ................................................................. 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ............................................................................. 35

*Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.,*
  No. 13-cv-6551, 2014 WL 4058321 (S.D.N.Y. Aug. 15, 2014) ........... 46, 50

*McDonnell v. Miller Oil Co.,*
  134 F.3d 638 (4th Cir. 1998) ............................................................. 37, 38

*Metric/Kvaerner Fayetteville v. Fed. Ins. Co.,*
  403 F.3d 188 (4th Cir. 2005) ............................................................... 43

*Nelson v. Adams USA, Inc.,*
  529 U.S. 460 (2000) ............................................................................. 15

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC,*
  537 F.3d 168 (2d Cir. 2008) ................................................................. 45

*Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.,*
  60 F.3d 153 (3d Cir. 1995) ................................................................... 39

*O.K. Petroleum v. Travelers Indem. Co.,*
  No. 09-cv-10273, 2010 WL 2813804 (S.D.N.Y. July 15, 2010) ........... 44, 45

*Obsessive Compulsive Cosmetics, Inc. v. Sephora USA, Inc.,*
  2016 WL 4953014 (N.Y. Sup. Ct. Aug. 18, 2016) ............................... 31

*One Source Envtl., LLC v. M+W Zander, Inc.,*
  13 F. Supp. 3d 350 (D. Vt. 2014) ....................................................... 47

*Overstreet v. Ky. Cent. Life Ins. Co.,*
  950 F.2d 931 (4th Cir. 1991) ............................................................. 19, 30

*Peacock v. Herald Square Loft Corp.,*
  889 N.Y.S.2d 22 (App. Div. 2009) ..................................................... 24, 47

*Pike Realty Co., LLC v. Cardinale*,
   21 Misc. 3d 1139(A) (N.Y. Sup. Ct. 2008) ................................................. 25

*Poller v. BioScrip, Inc.*,
   974 F. Supp. 2d 204 (S.D.N.Y. 2013) ........................................................ 48

*R&R Sails, Inc. v. Ins. Co. of Penn.*,
   673 F.3d 1240 (9th Cir. 2012) ................................................................... 38

*Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*,
   629 N.Y.S.2d 382 (App. Div. 1995) ........................................................... 25

*Random Ventures, Inc. v. Advanced Armament Corp., LLC*,
   No. 12-cv-6792, 2014 WL 113745 (S.D.N.Y. Jan. 13, 2014),
   *aff'd*, 614 F. App'x 523 (2d Cir. 2015) ...................................................... 46

*Ret. Bd. of Policemen's Annuity & Ben. Fund of Chicago v. Bank of N.Y. Mellon*,
   No. 11-cv-5459, 2014 WL 3858469 (S.D.N.Y. July 30, 2014) ................... 46

*Rosa v. TCC Commc'ns, Inc.*,
   No. 15-cv-1665, 2016 WL 67729 (S.D.N.Y. Jan. 5, 2016) ................... 45, 46

*Rose v. Spa Realty Assocs.*,
   366 N.E.2d 1279 (N.Y. 1977) ............................................................... 28, 31

*Rowland v. Am. Gen. Fin., Inc.*,
   340 F.3d 187 (4th Cir. 2003) ..................................................................... 40

*S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*,
   302 F.3d 667 (7th Cir. 2002) ..................................................................... 22

*Smith v. Munday*,
   848 F.3d 248 (4th Cir. 2017) ..................................................................... 18

*Sovereign Military Hospitaller Order v. Fla. Priory of the Knights Hospitallers*, 809 F.3d 1171
   (11th Cir. 2015) .......................................................................................... 37

*Spanos v. Skouras Theatres Corp.*,
   364 F.2d 161 (2d Cir. 1966) ....................................................................... 25

*Spriggs v. Diamond Auto Glass*,
    242 F.3d 179 (4th Cir. 2001) ................................................................................ 30

*Tex. A&M Research Found. v. Magna Transp., Inc.*,
    338 F.3d 394 (5th Cir. 2003) ................................................................................ 40

*Tolan v. Cotton*,
    134 S.Ct. 1861 (2014) ........................................................................................... 30

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
    894 F.2d 516 (2d Cir. 1990) ........................................................................... 28, 29

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007) ................................................................................... 45

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994) ................................................................................. 24

*U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*,
    873 F.2d 731 (4th Cir. 1989) ................................................................................ 23

*U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*,
    95 F.3d 153 (2d Cir. 1996) ................................................................................... 28

*United States v. Johnson*,
    228 F.3d 920 (8th Cir. 2000) ........................................................................... 38, 40

*United States v. Rapanos*,
    376 F.3d 629 (6th Cir. 2004), *vacated on other grounds*, 547 U.S. 715 (2006) ............... 37

*United States v. Rogers*,
    897 F.2d 134 (4th Cir. 1990) ................................................................................ 41

*United States v. STABL, Inc.*,
    800 F.3d 476 (8th Cir. 2015) ................................................................................ 40

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*,
    No. 09-cv-853, 2017 WL 743996 (N.D.N.Y. Feb. 24, 2017) ........................ 45, 46, 47

*Valladares v. Cordero*,
    552 F.3d 384 (4th Cir. 2009) ................................................................................ 30

*Van Asdale v. Int'l Game Tech.*,
   577 F.3d 989 (9th Cir. 2009) ................................................................. 30

*Wakefield v. N. Telecom, Inc.*,
   769 F.2d 109 (2d Cir. 1985) ................................................................. 47

*Wells v. Liddy*,
   186 F.3d 505 (4th Cir. 1999) ................................................................. 30

*Wilson v. Volkswagen of Am., Inc.*,
   561 F.2d 494 (4th Cir. 1977) ................................................................. 38

**Rules and Statutes**

12 U.S.C. § 1452(f) ...................................................................................... 1

28 U.S.C. § 1291 .......................................................................................... 1

Fed. R. Civ. P. 8(d) .................................................................................... 49

Fed. R. Civ. P. 26(e) .................................................................................. 40

Fed. R. Civ. P. 37(c)(1) ................................................................. 11, 36, 37, 38

Fed. R. Civ. P. 37(c)(1)(A)-(C) ................................................................. 39

Fed. R. Civ. P. 56(a) ............................................................................. 18, 36

**Other Authorities**

*Restatement (Second) of Contracts* (1981) ................................................ 21

U.S. Courts, *U.S. District Courts – Median Time from Filing of to Disposition of Civil Cases, by Action Taken* (2016) ................................................................. 15

Wright & Miller, 8B *Fed. Prac. & Proc. Civ.* § 2289.1 (3d ed.) ...................... 37

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 12 U.S.C. § 1452(f) because the Federal Home Loan Mortgage Corporation is a party. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment on February 23, 2017, and Computer Sciences Corporation submitted a timely notice of appeal on March 24, 2017. JA457-58.

## STATEMENT OF ISSUES

I.      Whether the district court erred by granting summary judgment on the claim for breach of contract.

II.      Whether the district court erred by granting summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

## STATEMENT OF CASE

This is a contract dispute between Computer Sciences Corporation ("CSC") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Freddie Mac is a federal corporation in Virginia. It buys mortgages and trades mortgage-backed securities. JA38. In March 2014, Freddie Mac decided to outsource its IT services—computers, internet, telephones, voicemail, and the like—to a third party. JA39. It hired CSC, a company that provides IT services to businesses across the globe. JA38-39. Freddie Mac and CSC negotiated a master services agreement and a first work order (collectively, "the contract"). The contract outlined the general terms of their relationship and the initial services that CSC would provide.

1

The contract is governed by New York law. JA575. It spans hundreds of pages and has several requirements. Three are particularly relevant here.

*Invoices*: CSC charged Freddie Mac for its services by submitting invoices. Invoices were due "within thirty (30) days after the end of the month in which the Services were performed." If a charge was "incapable of being determined" when the invoice was due, CSC could charge Freddie Mac "on a later invoice." "Such charges" had to be submitted within "ninety (90) days after the end of the month in which [they were] incurred." JA516. Further, the contract had special rules for invoicing "Base Charges," the baseline services that CSC provided on a recurring basis. JA583. The base charges increased when CSC reached a "Payment Milestone," *i.e.*, when it successfully implemented a new layer of services for Freddie Mac. But CSC could not invoice Freddie Mac for a base charge until Freddie Mac agreed that the milestone had been met. JA1141-42. Freddie Mac could not "unreasonably withhold, delay, or condition its approval of … a Milestone." JA927. Once approved, the milestones would "fully compensate" CSC for certain expenses, including "transition" costs. JA1140. Freddie Mac would not "separately reimburs[e]" any "Incidental Expenses" like "travel and lodging." JA512.

*Change Orders*: The contract specified several services that CSC would provide for Freddie Mac. CSC could not perform any "New Services"—services "materially different from, and in addition to" those already specified—unless Freddie Mac "authorized [it] via a duly executed Change Order." JA509-10. If CSC performed

2

new services without first obtaining a change order, the services would "be deemed to have been performed … at no additional charge." If all that the parties disagreed about was "pricing," however, CSC would "begin performance and the dispute regarding pricing [would] be resolved" later. JA510.

*Termination*: Freddie Mac could terminate the contract for several reasons, but its liability to CSC depended on the reason it gave. If Freddie Mac terminated the contract "for cause," it had to pay "Balance Sheet Amounts." But if Freddie Mac terminated the contract "for convenience," it also had to pay CSC "Early Termination Fees" and "Wind Down Expenses." JA669. Freddie Mac could terminate the contract for cause if, as relevant here, it experienced a "Critical Service Failure" in its voice or data services, which meant a disruption of longer than sixty minutes. JA564, JA1091. But under the contract's "Savings Clause," Freddie Mac could not rely on a critical service failure caused by its own nonperformance, so long as CSC gave it "prompt, reasonable notice of such nonperformance." JA534-35. And under the contract's "Force Majeure" clause, an "event beyond the reasonable control of a party" could not be held against CSC, so long as CSC notified Freddie Mac and did not cause the event or breach its obligation to provide backup systems. JA571-72.

A primary objective of the contract was to modernize Freddie Mac's voice and data systems. As CSC employees Paul Chisholm and Joseph Moran testified, however, this ended up being a more daunting task than anyone imagined. Based on the information that Freddie Mac provided, the parties initially agreed that CSC would

refresh Freddie Mac's local area network ("LAN") over the course of five years—twenty percent per year. JA2058. But a network assessment revealed that Freddie Mac's equipment was "archaic." JA2207-08. At a November 2014 meeting attended by Chisholm, the parties agreed that CSC would remediate ninety percent of the LAN by March 2015. JA2207-08, JA2041-42. Freddie Mac understood that this accelerated schedule would require more labor and superior equipment. JA2059. It never suggested that CSC would perform the extra work for free or that Freddie Mac would consider it part of the original contract. JA2059, JA2042. Freddie Mac happily accepted the accelerated LAN remediation, which was completed in March 2015. JA2059, JA2321, JA2317.

But when CSC requested a change order for the ███████ of extra labor, Freddie Mac rejected it. John Borgelt of Freddie Mac insisted that CSC was responsible for the increased costs because they were part of the original contract. JA2059-60. Yet when CSC later submitted invoices for the LAN remediation, Freddie Mac would claim that the services were "new" and, thus, needed to be approved by a change order. The baselessness of Borgelt's initial position was highlighted by Brian McNulty, Freddie Mac's director of network operations. McNulty testified that he thought a change order was approved "since we moved forward" with the accelerated LAN remediation. JA2377. Nevertheless, due to Borgelt's firm representation, CSC knew it was futile to request change orders for the other expenses it incurred on the accelerated LAN remediation (*e.g.*, maintenance and support). JA2060. In fact, internal

4

documents revealed that Freddie Mac did not even track CSC's requests for change orders—let alone review them seriously. JA2371.

Freddie Mac's approach to payment milestones was equally arbitrary. Before services were deployed, CSC and Freddie Mac would have "Go Live" meetings where Freddie Mac would approve or reject the deployment. CSC employee Christine Moore attended those meetings. JA2043-44. She attested that, on multiple occasions, Freddie Mac approved the deployment of services but, when time came to approve the milestone, Freddie Mac refused. Freddie Mac would raise an issue, CSC would fix it, and CSC would never hear back. Or Freddie Mac would claim, falsely, that earlier milestones were preconditions to later milestones and then never agree to the earlier ones—sometimes reversing positions on plans it had approved during the go-live meetings. Freddie Mac also would approve a milestone and then have another employee not involved in the approval process come in and rescind it. *See* JA2043-49, JA2321-23, JA2317.

These incidents are just a few examples of what the (non)working relationship between CSC and Freddie Mac was like. On a daily basis, Freddie Mac made life difficult for CSC, as recounted by CSC employees and verified by an internal Freddie Mac document titled "Lessons Learned." Although Freddie Mac hired CSC to manage its IT services, Freddie Mac treated CSC more like an employee. Freddie Mac's employees managed CSC's, not the other way around. JA2331. In Freddie Mac's words, "Our engineers want[ed] to define the design instead of letting CSC do it as

the Managed Service Provider[.] It was the engineers running the project, which is why all of the requirements were being changed and the contractual terms were not being taken into account." JA2370. Freddie Mac also imposed artificially tight deadlines on CSC: "Transition was driven by deadline rather than by defined service commencement acceptance procedures and transition milestones," and "the timeline, which could not be moved," was the "biggest problem." JA2374. But while Freddie Mac insisted on speed from CSC, it dragged its heels whenever CSC needed Freddie Mac to provide information or approval. JA2213, JA2217-18, JA2284-85, JA164-67.

Freddie Mac's tight deadlines also caused it to forego a secondary circuit, which would have acted as a backup if the first one failed. JA2282, JA2299-300. That decision proved ill-advised when, over the holiday weekend on July 4-6, 2015, Freddie Mac's systems went down. The initial cause was random: someone threw a firework down a manhole, which knocked out Freddie Mac's circuit. JA2301. This should not have been a problem. Even without a secondary circuit, CSC designed Freddie Mac's systems to failover to an alternate data center so that its services could continue uninterrupted. JA2301. CSC had tested the failover fourteen times before the July 4 incident, and it worked every time. JA2300, JA2302. But, for some reason, the backup systems failed on July 4.

During the scramble to get Freddie Mac back online, CSC wondered if the backup failure might have been its fault. An internal CSC document pointed to "[c]onfiguration & architectural flaws in CSC's UCaaS solution that precluded a

6

complete fail over by means other than a circuit"—though, it also noted that "a fail over back up circuit" would have prevented the problem. JA1893. Additionally, CSC executive Steve Hilton sent an internal email on July 5 (while the outage was still ongoing), calling the outage "embarrassing" and complaining that CSC's system "is just not ready for prime time and I think poorly conceived." JA104. A week later, Hilton sent another email to Freddie Mac, "apologiz[ing] for the pain this caused to your firm" and taking the blame for the backups' failure. JA107. As Hilton would later explain in his deposition, however, he sent these emails during "the heat of the [outage]" before he "was[] aware of all the facts of the underlying issues and the culpability." JA2223-25. He also explained that his primary gripe with CSC's systems is that they require "massive dependencies on the client" to manage the network properly on its end. JA2223.

It turns out that Freddie Mac's mismanagement was exactly what caused the backup systems to fail. While working with Freddie Mac to discover the cause, CSC employees determined that Freddie Mac had misconfigured its domain name system (DNS) server. JA2302. The DNS server is like a map that tells information where to go, so Freddie Mac's misconfiguration thwarted the backup system by preventing communications to the alternate data center. JA2300. CSC informed Freddie Mac of this problem at a meeting in September 2015. JA2302. In response, Freddie Mac reconfigured its DNS settings to prevent the problem from happening again. JA2302.

7

All told, Freddie Mac experienced little inconvenience from the July outage because it happened on a Saturday, Sunday, and federal-holiday Monday. JA2301. Nevertheless, on August 3, 2015, Freddie Mac notified CSC that it was terminating the contract. The notice stated that Freddie Mac was terminating for cause, but it did not explain Freddie Mac's justification for doing so. JA2332. As it turns out, in May and June 2015 (months before the outage), Freddie Mac executives were brainstorming how to get out of the contract. Robert Lux, the chief informational officer, sent an email on May 20, stating, "I don't think CSC provided a reasonable level of service." He followed up with another email stating his "obvious preference … to pay [CSC] nothing for implementation" and asking "whether the SLA's are written in a way to support this position." JA2379. Yet another email in June stated, "[W]e have not paid CSC anything" and "they can't backbill us for services." JA 2383.

After receiving the notice of termination, CSC submitted invoices for the work it had completed but Freddie Mac had not yet paid. CSC submitted four invoices for base charges (Invoices 1-4), one invoice for LAN-remediation labor (Invoice 25), nineteen invoices for LAN-remediation maintenance and support (Invoices 34-52), and others. JA673. Although the invoices were submitted more than thirty days after the services were provided, CSC had been waiting on Freddie Mac to approve milestones and change orders—approval that never came. CSC also asked Freddie Mac to pay the balance sheet amounts—including transition costs for travel, labor, maintenance, and support—and early termination fees and wind-down expenses. The

following table reflects these expenses and the reasons that Freddie Mac offered at summary judgment for not paying them.

| Expense | Amount | Reason for Nonpayment |
|---|---|---|
| **Base Charges** | | |
| Invoice 1 | ███████ | Untimely |
| Invoice 2 | | Untimely |
| Invoice 3 | | Untimely |
| Invoice 4 | | Untimely |
| **LAN Remediation** | | |
| Invoice 25 | ███████[1] | Unauthorized |
| Invoice 34 | | Untimely; unauthorized |
| Invoice 35 | | Untimely; unauthorized |
| Invoice 36 | | Untimely; unauthorized |
| Invoice 37 | | Untimely; unauthorized |
| Invoice 38 | | Untimely; unauthorized |
| Invoice 39 | | Untimely; unauthorized |
| Invoice 40 | | Untimely; unauthorized |
| Invoice 41 | | Untimely; unauthorized |
| Invoice 42 | | Untimely; unauthorized |
| Invoice 43 | | Untimely; unauthorized |
| Invoice 44 | | Untimely; unauthorized |
| Invoice 45 | | Untimely; unauthorized |
| Invoice 46 | | Untimely; unauthorized |
| Invoice 47 | | Untimely; unauthorized |
| Invoice 48 | | Untimely; unauthorized |
| Invoice 49 | | Unauthorized |
| Invoice 50 | | Unauthorized |
| Invoice 51 | | Unauthorized |
| Invoice 52 | | Unauthorized |
| **Balance Sheet Amounts** | | |
| Transition Costs | ███████ | Unauthorized |
| **Termination Fees** | | |
| Early Termination Fees | ███████ | Termination was for cause |
| Wind-Down Expenses | ███████ | Termination was for cause |

---

[1] Freddie Mac has paid ███████ of this amount already. JA673.

When Freddie Mac refused to pay these expenses, CSC filed a complaint in the Eastern District of Virginia, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. JA25-37. After the complaint was amended, Freddie Mac filed a motion to dismiss. It argued, among other things, that CSC's claim for breach of the implied covenant was "duplicative" of its claim for breach of contract. Docket Entry ("DE") 47. The district court disagreed and denied the motion. DE 54.

Discovery commenced. All told, the parties produced more than half a million documents and deposed over a dozen witnesses. On October 25, 2016, CSC disclosed its experts, including Stuart Harris. JA245. Harris is a consultant with over twenty years of experience in IT management. JA157. Although he had only a "limited set of documentation" available, JA163, his initial report explained that Freddie Mac consistently failed to report information to CSC in a timely fashion, which raised the prospect of technological failures on its end. JA163-67. Because discovery was ongoing, though, Harris "intend[ed] to supplement in a later report as more information becomes available." JA159. Harris did so in an initial rebuttal report on November 8, 2016. JA172. After reviewing more documents, Harris had a firmer opinion that the "Critical Services Failures … were indeed caused, in part or in whole, by Freddie Mac." JA178. But discovery remained ongoing, so Harris stated that he "intend[ed] again to supplement [his] opinions in a later report as more information continues to become available." JA174.

10

After Harris's second report, the parties produced thousands of additional documents and deposed six more fact witnesses. Freddie Mac also deposed Harris on November 21, 2016. At the end of his deposition, the parties acknowledged that Harris would file another report, and they agreed to reconvene for another deposition once he did. JA229-30, JA2074. Harris submitted that report on December 19, 2016, after he had "completed [his] full investigation." JA2278. The report confirmed that Freddie Mac had misconfigured its DNS server and had caused the backup failure in July. JA2282, JA2302. Because the deadline for rebuttal reports had passed, however, Freddie Mac filed a motion to strike the report as untimely. At no point did Freddie Mac ask to reopen Harris's deposition.

The district court granted the motion to strike in a summary order, which incorporated "the reasons stated in the hearing on January 13, 2017." JA425. At that hearing, the court rejected CSC's argument that its nondisclosure was "substantially justified" or "harmless" under Federal Rule of Civil Procedure 37(c)(1). The court also rejected CSC's argument that, even absent those exceptions, it should impose sanctions short of exclusion. The district court stated that alternative sanctions are not allowed: "[T]he sanction *every time* is, absent substantial justification, is to exclude the report. So let's focus on [substantial justification] because that's all I'm going to listen to." JA402 (emphasis added).

Around the same time it filed its motion to strike, Freddie Mac filed a motion for partial summary judgment. In it, Freddie Mac asked the district court to rule that it

11

did not breach the contract by failing to pay Invoices 1-4, 25, 34-52, transition costs, early termination fees, or wind-down expenses. Freddie Mac also reraised its argument from the motion to dismiss that CSC's implied-covenant claim was duplicative of its breach-of-contract claim. The district court granted summary judgment for Freddie Mac on all of these arguments, except Invoices 2-4.

Freddie Mac argued that it was excused from paying Invoices 1-4 (base charges) because Freddie Mac submitted them more than thirty days after providing the services. CSC responded that its tardiness should be excused because the contract did not allow it to invoice until Freddie Mac approved the milestones, and Freddie Mac unreasonably refused to approve them.

The district court agreed with CSC on Invoices 2-4. Freddie Mac's approval of milestones was a prerequisite to CSC's duty to invoice, the court noted, and "factual issues remain" on whether "Freddie Mac … unreasonably withheld approval of the Milestone." "Summary Judgment" was thus "inappropriate … on these three invoices." JA433. The district court did not apply this reasoning to Invoice 1, however. Unlike Invoices 2-4, Invoice 1 was submitted more than ninety days after service. The district court concluded that this violated the ninety-day limitation in the contract provision governing indeterminate invoices. Notably, the district court raised this argument on its own: Freddie Mac never argued that Invoice 1 should be treated differently from Invoices 2-4, never relied on the fact that Invoice 1 was more than

12

ninety days late, and never quoted the part of the contract that governs indeterminate invoices.

Next, Freddie Mac argued that Invoices 25 and 34-52 (LAN remediation) were unauthorized because it never approved the change orders. It also argued that a subset of those invoices—Invoices 34-48—were untimely. CSC responded that Freddie Mac denied the change orders in bad faith, so it could not use that as a basis for avoiding liability. CSC also argued that, based on the parties' discussions and conduct, Freddie Mac orally waived the change-order requirement.

The district court rejected CSC's argument that the Freddie Mac had orally waived the change-order requirement. Although Chisholm submitted a declaration to that effect, the district court rejected it as inconsistent with his earlier deposition testimony. JA437. The district court also viewed CSC's evidence as reflecting, "[a]t best, … communicat[ions] about a possible agreement." According to the court, "no formal agreement was reached." JA437. The district court did not consider CSC's alternative argument about Freddie Mac's bad faith.

Freddie Mac resisted the ████████ in transition costs on the ground that they were recoverable only through the payment milestones, which Freddie Mac never approved. CSC responded that the transition costs were recoverable as balance sheet amounts and that Freddie Mac cannot rely on its own refusal to approve the milestones to escape liability. In reply, Freddie Mac pointed to the contract provision that prohibits recovery for "incidental expenses," including "travel" costs. The district

court focused on the latter point and agreed with Freddie Mac that "the Contract excludes the application of travel costs." JA441.

With respect to the early termination fees and wind-down expenses, Freddie Mac asked the district court to rule, as a matter of law, that it terminated the contract for cause, not for convenience. Freddie Mac argued that CSC could point to no evidence suggesting that the July outage was Freddie Mac's fault or that CSC provided it with "prompt, reasonable notice" of that fact.

The district court agreed with both arguments. It concluded that "CSC musters no citations to the record in support of its claim that Freddie Mac's mishandling of DNS servers caused the breakdown" or that "it promptly notified Freddie Mac." JA443. Of course, CSC pointed repeatedly to Harris's final report. *See* JA2016, JA347, JA254. By then, however, the district court had already ruled in favor of Freddie Mac on the motion to strike. JA407, JA425.

Finally, the district court—in a reversal of its earlier ruling on the motion to dismiss—agreed with Freddie Mac that CSC's claim for breach of the implied covenant of good faith and fair dealing was duplicative of its claim for breach of contract. The court reversed course, it explained, because CSC gave "nearly word-for-word identical" answers to two of Freddie Mac's interrogatories. Interrogatory 13 asked CSC to provide the "factual bases" for its implied-covenant claim, JA1952, and Interrogatory 6—according to the district court's paraphrasing—asked CSC to provide "any factual basis for breach of contract due to gross negligence, willful

14

misconduct, or fraud allegations." JA447; *but cf.* JA1947. The district court then analyzed CSC's individual allegations and concluded they were duplicative, unsupported by the record, or both. JA448-50.

After the district court awarded partial summary judgment to Freddie Mac, the parties settled the rest of their claims. But CSC reserved its right to appeal most of the partial summary-judgment ruling. JA452-54. The district court entered final judgment, JA456-57, and CSC timely appealed. JA458.

## SUMMARY OF ARGUMENT

The Eastern District of Virginia is often called the "Rocket Docket." A well-earned title, as the court resolves civil cases faster than every other district in the country. *See* U.S. Courts, *U.S. District Courts – Median Time from Filing of to Disposition of Civil Cases, by Action Taken* (2016). The court's speediness is no doubt a point of pride. But the desire to terminate cases quickly cannot come at the expense of the summary-judgment procedures—time-tested rules that are "designed to further the due process of law that the Constitution guarantees." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 290 (4th Cir. 2013) (en banc) (quoting *Nelson v. Adams USA, Inc.,* 529 U.S. 460, 465 (2000)). When district courts "rush to summary judgment," they not only deny litigants this process, but they also tend to make "preliminary errors" of law that mask the existence of genuine disputes of material fact. *Id.*

Respectfully, that is what happened here. On each of the claims that CSC appeals, the district court made a preliminary error of law, improperly weighed the evidence, or both. On the breach-of-contract claim:

*Invoice 1*: The district court misread the contract to bar invoices submitted after ninety days. The provision it cited does not say that, Freddie Mac did not rely on it, and the district court abused its discretion by raising the argument without giving CSC notice or an opportunity to respond. Once this error is corrected, all agree that the record presents genuine factual disputes about whether Freddie Mac unreasonably withheld approval of milestones.

*Invoices 25 and 34-52*: The district court did not appreciate that CSC's duty to invoice was subject to a condition precedent: Freddie Mac's approval of the change orders. Under New York law, Freddie Mac had an implied duty to review the change orders in good faith, and its failure to do so excused CSC's failure to submit the invoices on time. Whether Freddie Mac acted in good faith presents a genuine factual dispute. Alternatively, there is a genuine factual dispute about whether Freddie Mac orally waived the requirement to obtain a change order.

*Transition Costs*: The district court disallowed the transition costs because the contract prices "incidental expenses" like "travel" into the payment milestones. But the district court missed the fact that many of CSC's transition costs are for core services, not incidental expenses or travel. And it missed the fact that Freddie Mac denied approval of the milestones, which frustrated a condition precedent to CSC's

16

duties. There is a genuine factual dispute about whether Freddie Mac's denial was unreasonable.

*Early Termination Fees and Wind-Down Expenses*: The district court concluded that CSC presented no evidence that Freddie Mac was responsible for the July outage or that CSC notified Freddie Mac of that fact. But CSC presented persuasive testimony on both issues—Harris's report—which the district court struck as a discovery violation. In doing so, the district court abused its discretion by assuming it had no choice but to exclude the report and by failing to consider lesser sanctions.

The district court similarly erred in granting summary judgment on CSC's claim for breach of the implied covenant of good faith and fair dealing. Foremost, it misstated the test for duplication. In New York, an implied-covenant claim is not duplicative of a breach-of-contract claim unless it relies on an *express* provision of the contract. Although the two claims cannot rely on the exact same facts and seek the exact same damages, factual overlap is permissible. Accordingly, Freddie Mac could violate the implied covenant by denying change orders in bad faith, and violate the contract by failing to pay Invoices 25 and 34-52. Freddie Mac also could violate the implied covenant by terminating the contract in bad faith, and violate the contract by refusing to pay early termination fees and wind-down expenses.

Regardless, CSC has raised a host of other allegations that are concededly non-duplicative. It submitted more than enough evidence to present genuine disputes of

material fact on each of them. The district court concluded otherwise only after reading the evidence and drawing inferences adverse to CSC—precisely the opposite of what it must do at the summary-judgment stage.

In sum, the claims that CSC raises on appeal should have gone to trial. This Court should reverse and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment is warranted "only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Smith v. Munday*, 848 F.3d 248, 252 (4th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). A dispute is "genuine" if the nonmovant "present[s] evidence from which a [trier of fact] might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

The key word is *might*. A district court cannot grant summary judgment "merely because [it] believes that the movant will prevail" at trial. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). Summary judgment is inappropriate "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmovant] cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).

In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. This means that the nonmovant "is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.'" *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). The court, in other words, "must disregard all evidence favorable to the moving party … that a [factfinder] would not be required to believe," *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 436 (4th Cir. 2001), and "cannot weigh the evidence or make credibility determinations," *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). The court takes this approach because, "[a]t the summary judgment stage," its "function is not … to … determine the truth of the matter but to determine whether there is a genuine issue for trial." *Am. Metal Forming Corp. v. Pittman*, 52 F.3d 504, 507 (4th Cir. 1995).

## ARGUMENT

The district court incorrectly granted summary judgment against CSC on both its claim for breach of contract and its claim that Freddie Mac violated the implied covenant of good faith and fair dealing. In rejecting CSC's claims, the district court

committed several legal errors. Those errors obscured the many genuine disputes of fact that remain. This Court should reverse.

## I.    The district court should have denied summary judgment on the claim for breach of contract.

Freddie Mac asked the district court to rule that it was not required to pay several categories of CSC's contract damages: Invoice 1 (because it was untimely); Invoices 25 and 34-52 (because they were not authorized by a change order and because some were untimely); transition costs (because Freddie Mac never accepted the milestones); and early termination fees and wind-down expenses (because the contract was terminated for cause, not convenience). The district court agreed with Freddie Mac and granted the motion. It erred on all three categories.

### A.    Invoice 1 presents a genuine dispute of material fact.

Below, Freddie Mac argued that it was not required to pay Invoice 1 because CSC did not submit it within thirty days. But this argument misreads the contract and ignores Freddie Mac's role in preventing CSC from submitting this invoice.

Freddie Mac is correct that the contract requires CSC to submit invoices within thirty days of service. For base charges, however, the contract also states that CSC "shall not begin invoicing … prior to" Freddie Mac agreeing that CSC has "achieve[d] … the applicable … Payment Milestone." JA1141. In other words, Freddie Mac's approval of the milestone was a condition precedent to CSC's duty to invoice. Because Freddie Mac withheld approval of the milestone, CSC was not required to

submit an invoice—within thirty days or otherwise. "Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." *Restatement (Second) of Contracts* § 225 (1981).

Moreover, Freddie Mac's nonapproval breached the contract. The contract bars Freddie Mac from "unreasonably withhold[ing] … approval of … a Milestone." JA927. Freddie Mac acted unreasonably by, for example, happily deploying and using services but then claiming they were unacceptable when it came time to approve the milestone; adding acceptance criteria that did not exist; and giving approval but then having someone not on the approval list revoke it. JA2044-49, JA2321-23, JA2317. Due to its breach, Freddie Mac has no right to complain about CSC's failure to submit Invoice 1 within thirty days. "Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." *Restatement (Second) of Contracts* § 245.

The district court agreed with this analysis. It acknowledged that Freddie Mac's approval of the milestone was a condition precedent to CSC's duty to invoice. Hence, "if approval was unreasonably withheld, then CSC was … entitled to belatedly invoice." JA433. The district court also recognized that whether Freddie Mac "unreasonably withheld approval of the Milestone" presents "factual issues" that make summary judgment "inappropriate." JA433. That is why the district court denied summary judgment on Invoices 2-4.

21

The district court should have denied summary judgment on Invoice 1 for the same reason. The court treated Invoice 1 differently because, unlike Invoices 2-4, CSC submitted Invoice 1 "more than ninety days" after service. JA433. But the court pulled this ninety-day requirement from the provision of the contract dealing with indeterminate invoices. That provision allows CSC, if it cannot calculate a particular charge at the time of invoicing, to include the charge on a later invoice, so long as it does so within ninety days of service. JA516. The district court read this ninety-day limit as a kind of statute of repose, authorizing Freddie Mac to forever ignore any invoice submitted more than ninety days after service. This was error for two reasons.

First, Freddie Mac never made this argument; the district court invoked the ninety-day provision on its own without warning. Although courts can grant summary judgment on grounds not raised by the parties, they must first give the losing party notice and an opportunity to respond. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Hughes v. Stottlemyre*, 454 F.3d 791, 800 (8th Cir. 2006); *John Deere Co. v. Am. Nat. Bank*, 809 F.2d 1190, 1192 (5th Cir. 1987). Without this procedural protection, "a decision granting summary judgment on a basis not argued by the parties" would "conflict with the traditional adversarial precepts of our system of justice" and "prejudice plaintiffs by depriving them of the opportunity" to present arguments and evidence on their behalf. *S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 678 (7th Cir. 2002). The district court did not follow this procedure. Accordingly, its decision should be reversed "regardless of [the] merits" of

22

CSC's arguments. *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 736 (4th Cir. 1989).

Second, and more fundamentally, the district court misunderstood the ninety-day provision. By its plain language, the ninety-day limitation applies only when a charge is indeterminate—*i.e.*, "where a particular month's invoice indicates that certain charges are incapable of being determined as of the date of such invoice." JA516. "*Such* charges" may not be billed "later than ninety (90) days after the end of the month in which incurred." JA516 (emphasis added). The ninety-day provision does not apply to *all* invoices, as the district court reasoned; nor does it state that invoices submitted after ninety days of service are forever barred. It instead describes a specific process for dealing with indeterminate charges. Because this case does not involve indeterminate charges, the ninety-day limitation does not apply. That is presumably why Freddie Mac never made this argument.

In sum, Invoice 1 presents genuine disputes of material fact about whether Freddie Mac unreasonably withheld approval of payment milestones. The district court agreed that the reasonableness of Freddie Mac's conduct presented questions for trial, which is why it denied summary judgment on Invoices 2-4. It declined to do the same on Invoice 1 based on an interpretation of the contract that was neither correct nor advanced by any party.

**B.      Invoices 25 and 34-52 present genuine disputes of material fact.**

Under the contract, Freddie Mac had an express duty to pay CSC for the services it provided, including LAN remediation. Freddie Mac argued below that it was not responsible for Invoices 25 and 34-52 because it never approved the LAN remediation in a formal change order. It argued, in the alternative, that Invoices 34-48 were untimely because they were submitted more than thirty days after service. CSC made two arguments in response: first, Freddie Mac acted in bad faith when it denied the change orders and, second, Freddie Mac orally waived the change-order requirement. The district court ignored the first argument and rejected the second. It erred both times.

First, if Freddie Mac denied the change orders in bad faith, then it cannot rely on CSC's failure to secure a change order to avoid its contractual duty to pay CSC for the LAN remediation. Although the contract does not expressly limit Freddie Mac's discretion to deny change orders, New York law imposes an implied duty on Freddie Mac to exercise that discretion in good faith. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith."); *Peacock v. Herald Square Loft Corp.*, 889 N.Y.S.2d 22, 24 (App. Div. 2009) ("Even if the [contract] does not, on its face, set limits on the [defendants'] ability to refuse to approve the scope of work, the contract's implied covenant of good faith and fair dealing would prevent

24

defendants from exercising that power arbitrarily … or unreasonably."). If a party's breach of this implied duty prevents a condition precedent from occurring, then the condition is excused. *See ADC Orange, Inc. v. Coyote Acres, Inc.*, 857 N.E.2d 513, 517 (N.Y. 2006); *Arc Elec. Const. Co. v. George A. Fuller Co.*, 247 N.E.2d 111, 113 (N.Y. 1969); *Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 629 N.Y.S.2d 382, 387 (App. Div. 1995). "One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition." *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966).[2]

The district court overlooked this fundamental point. After concluding that the parties had not orally modified the contract, it jumped to the conclusion that the lack of a change order defeated CSC's claim. But when CSC submitted change orders, Freddie Mac denied them in bad faith. CSC's evidence bears this out. After requesting the accelerated LAN remediation and accepting CSC's work, Freddie Mac insisted that the work was part of the original contract. JA2060. Then it reversed course and insisted that the work was "New Services" subject to a change order. Indeed, Freddie

---

[2] This does not mean that CSC's breach-of-contract claim is duplicative with its implied-covenant claim. For purposes of CSC's breach-of-contract claim, the implied covenant estops Freddie Mac from relying on its failure to approve the change orders as a defense to its contractual duty to pay CSC. For the contract claim, in other words, the implied covenant negates a defense. For the implied-covenant claim, it is the basis for liability. Under New York law, bad-faith conduct "not only preclude[s] [a defendant] from using the failure of the condition to avoid the contract, but also subjects it[] to a claim for breach of the implied covenant of fair dealing and good faith." *Pike Realty Co., LLC v. Cardinale*, 21 Misc. 3d 1139(A) (N.Y. Sup. Ct. 2008). This distinction is explained in more detail below. *See infra* II.

Mac never took the change-order process seriously; it admitted that it did not even track CSC's requests. JA2371.

This bad faith excused CSC's duty to obtain change orders. Although CSC did not request change orders for some of the invoices, it chose that route only after Freddie Mac said it would not approve them because CSC should bear the costs for the accelerated LAN remediation. JA2059-60. At that point, Freddie Mac's bad faith excused CSC's duty to request change orders. *See Cohen v. Kranz*, 189 N.E.2d 473, 476 (N.Y. 1963) (explaining that a condition precedent is "excuse[d]" when a part receives "advance notice from the other party that he will not perform his part"); *CIBC Bank & Trust Co. (Cayman) v. Banco Cent. do Brasil*, 886 F. Supp. 1105, 1113 (S.D.N.Y. 1995) ("When a defendant's behavior demonstrates that satisfaction of a condition precedent would be futile, the plaintiff is relieved from satisfying that condition."). That Freddie Mac approved other, unrelated change orders, *see* JA434, is irrelevant; Freddie Mac specifically and unequivocally refused to approve change orders for the accelerated LAN remediation.

For the same reason, Freddie Mac cannot rely on CSC's failure to submit Invoices 34-48 on time. The contract states that "CSC shall invoice Freddie Mac for all amounts due under this Agreement … within thirty (30) days after the end of the month in the which the Services were performed." JA516. But Freddie Mac's approval of a change order was a condition precedent to CSC's duty to invoice. Services not authorized by a change order would not be "Services" "under this

26

Agreement." And the "amounts" charged for those services would never be "due" because unauthorized services are performed "at no additional charge." JA510. Freddie Mac agrees with this interpretation of the contract. *See* JA471, JA482.

Again, the district court missed this argument. It noted that Invoices 34-48 were not "base charges" and, thus, not conditioned on Freddie Mac's approval of a milestone. JA434. True enough, but that does not mean they were subject to *no* conditions. As Freddie Mac concedes, Invoices 34-48 were conditioned on its approval of change orders. If Freddie Mac denied the change orders in bad faith, then CSC's duty to submit the invoices—within thirty days or otherwise—was excused.

In short, Freddie Mac's bad faith matters. Plainly, CSC has raised genuine factual disputes on that question. *See Fortress Re, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 766 F.2d 163, 166 (4th Cir. 1985) ("[G]ood faith … unlikely … can be resolved by summary judgment. Even when basic facts are not in dispute, conflicting inferences can arise on … intent and purpose."). Because factual disputes remain about whether Freddie Mac denied the change orders in bad faith, the district court should have denied summary judgment on Invoices 25 and 34-52.

Alternatively, the district court should have denied summary judgment because Freddie Mac orally waived the change-order requirement. In New York, a plaintiff can recover "for extra work, orally directed, outside the scope of the contract, notwithstanding [a] provision [in the contract stating] that a claim for extra work must be supported by written authorization." *U.S. for Use & Benefit of Evergreen Pipeline Const.*

27

*Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 165 (2d Cir. 1996); *accord CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983). Such "an oral modification may be enforced when there has been partial performance of the agreement to modify, so long as the partial performance is 'unequivocally referable to the oral modification.'" *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (quoting *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977)). Performance is "unequivocally referable" to an oral modification if it is "inconsistent with the agreement as written." *Id.*

CSC has submitted enough evidence for a reasonable factfinder to conclude that Freddie Mac orally modified the contract. Chisholm testified in his deposition that, once the parties discovered that Freddie Mac's LAN equipment needed an overhaul, representatives of CSC and Freddie Mac "had a meeting" and "agreed" to "modify[]" the agreement and work on a "new timeline." JA2208. Chisholm repeated this testimony in his declaration. "Freddie Mac representatives agreed" that CSC would perform the accelerated LAN remediation, he explained, and all parties understood Freddie Mac was "going to have to pay" for that work. JA2042. Moran similarly attested that Freddie Mac "approved the accelerated LAN remediation" with full knowledge of the increased costs and without suggesting it would not pay. JA2059. CSC did, in fact, perform the LAN remediation on the terms that Chisholm outlined, and Freddie Mac "accepted the extra work [CSC] performed." *B. Reitman Blacktop, Inc. v. Missirlian*, 860 N.Y.S.2d 211, 212 (App. Div. 2008). This work was

28

"unequivocally referable" to the parties' oral agreement because it was "inconsistent with the agreement as written." *Towers Charter*, 894 F.2d at 522. As Freddie Mac concedes, the accelerated LAN remediation was "performed outside the scope of the Contract" because it lacked prior "authorization by way of an executed change order." JA466.

The district court incorrectly discounted CSC's evidence. The court found that Chisholm's declaration contradicted his earlier "deposition testimony where he stated that 'there was no agreement or nonagreement.'" JA437. But that was not Chisholm's earlier testimony. He made the quoted statement while explaining why he believed the relationship with Freddie Mac had failed. Chisholm complained about "the scope changes" that Freddie Mac had imposed and, when asked whether "the scope changes were … agreed to by CSC," he answered:

> The scope changes were a result of the LAN, okay, so it wasn't like we agreed to it. It was a realization that the environment was different from what we were told. So there was no agreement or nonagreement. Okay. The script changed.

JA277. Chisholm was not denying that CSC agreed to do the LAN remediation; he was complaining that CSC felt like it had no *choice* because Freddie Mac's equipment was so bad. His statement only confirms that the parties modified the contract, hence his use of the phrase "the scope *changes*." Chisholm obviously was not recanting his testimony that CSC and Freddie Mac changed the contract—testimony he gave countless times in his deposition. *See, e.g.*, JA2208 ("We reviewed the new timeline. We

all agreed to it."), JA2208 ("[M]odifying … was a point of concern …. But ultimately we all did agree."), JA2208 (acknowledging that "the parties agreed on a revised timeline"), JA2207 (testifying that the parties "shifted substantially" and "added to the plan"). The district court "took too narrow a view" of Chisholm's deposition, "discounting several more definite statements of what transpired on the basis of one slightly unclear statement." *Wells v. Liddy*, 186 F.3d 505, 527 (4th Cir. 1999).

Even if Chisholm's deposition and declaration appeared to be inconsistent, "[w]hether [a witness] contradicted himself to the point of discrediting his testimony is a question for a trier of fact to decide." *Valladares v. Cordero*, 552 F.3d 384, 390 n.2 (4th Cir. 2009). At summary judgment, the district court must "review [deposition testimony] in its full context and view it in the light most favorable to … the nonmoving party," *Wells*, 186 F.3d at 527; and, if the testimony is ambiguous, the nonmovant "is entitled to have … his version of all that is in dispute accepted," *Overstreet*, 950 F.2d at 937. The district court did the opposite. "By weighing the evidence and reaching factual inferences contrary to [CSC's] competent evidence," the court invaded the province of the trier of fact. *Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014).[3]

---

[3] Notably, the district court did not strike Chisholm's declaration as a "sham," even though Freddie Mac asked it to. *See* JA2398. Nor could it have, given the lack of a "clear and unambiguous" inconsistency between Chisholm's declaration and deposition. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009); *accord Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 n.7 (4th Cir. 2001).

The district court also thought that Chisholm's testimony "[a]t best … suggests that the parties had conversations about revising the agreement," not that a "formal agreement was reached." JA437. As a factual matter, that is wrong. Chisholm testified, repeatedly, that the parties reached an agreement. *See, e.g.*, JA2042 ("[T]he Freddie Mac representatives agreed."), JA2208 ("We all agreed to it."), JA2208 ("[U]ltimately we all did agree."). As a legal matter, moreover, CSC does not need eyewitness testimony to prove the existence of an oral modification. In New York, the parties' "actions" can "demonstrate, objectively, the nature and extent of the modification." *Rose*, 366 N.E.2d at 1283. "[T]he court may consider not only past oral exchanges, but also the conduct of the parties." *Id.*

Here, CSC's performance of the accelerated LAN remediation is circumstantial evidence that the parties modified the agreement. After all, companies normally do not provide services for free. *See Obsessive Compulsive Cosmetics, Inc. v. Sephora USA, Inc.*, 2016 WL 4953014, at *3 (N.Y. Sup. Ct. Aug. 18, 2016). CSC's performance, especially when combined with Chisholm's testimony, is more than enough to create a genuine dispute about whether the contract was orally modified. *See Am. Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 140-43 (4th Cir. 1989) (reversing a district court that "too hastily granted … summary judgment" on whether the defendant orally waived a condition); *DeLago v. Robert Plan Corp.*, No. 04-cv-3193, 2006 WL 489845, at *4 (S.D.N.Y. Feb. 28, 2006) (explaining that, at summary judgment, "it is enough that an enforceable oral agreement … could reasonably exist" and that its existence

31

"frequently involves questions of fact, and cannot be decided on a summary judgment motion").[4]

## C.    The transition costs present a genuine dispute of material fact.

In its reply brief below, Freddie Mac argued that it does not have to pay transition costs because these charges were priced into the payment milestones and the contract did allow separate recovery for "travel" costs. The district court agreed that "the Contract excludes the application of travel costs." JA441. This analysis is both incomplete and incorrect.

It is incomplete because CSC's transition costs were not just "travel" costs. A CSC employee, Brian Russo, detailed the transition costs in a spreadsheet attached to his declaration, and most of the charges were for labor, maintenance, and support— not travel. *See* DE 204 Ex. C (Pivot of Freddie Mac Transition Charges by Cost Type). Although the contract does not allow separate recovery for "Incidental Expenses" like "travel and lodging," JA512, the labor, maintenance, and support that CSC provided are core services that are hardly "incidental." Even if travel costs were incidental, the district court ignored the fact that CSC sought much more than that.

---

[4] The cases cited by the district court, JA437, are not to the contrary. In *DiStefano v. Maclay*, the evidence of an oral modification was insufficient because the plaintiff "fail[ed] to adduce facts to support either a partial performance or equitable estoppel." 102 F. App'x 188, 190 (2d Cir. 2004). Not so here. And, in *John Street Leasehold LLC v. FDIC*, the court was not discussing the requirements for proving oral modifications when it observed that "[t]he allegedly pivotal conversation … trail[ed] off without a clear resolution." 196 F.3d 379, 382 (2d Cir. 1999). The court was discussing whether an agent had the authority to bind its principal. *See id.*

The district court also was incorrect because, again, it ignored Freddie Mac's unreasonable conduct. The contract excludes incidental expenses because they are "included in CSC's charges and rates provided in this Agreement." JA512. As Freddie Mac concedes, the transition costs were supposed to be included in the payment milestones—milestones that Freddie Mac never accepted. JA484; *see also* JA1141. But, as explained above, Freddie Mac acted unreasonably in denying the milestones. Its breach therefore excused CSC's duties to get Freddie Mac's approval and to invoice for the transition costs. Genuine factual disputes remain over whether Freddie Mac acted unreasonably. *See supra* I.A.

## D. The early termination fees and wind-down expenses present genuine disputes of material fact.

The parties agree that, unless Freddie Mac terminated the contract for cause, it must pay early termination fees and wind-down expenses. Whether Freddie Mac terminated for cause turns on which party was at fault for the failure of the backup systems during the July outage. The contract allowed Freddie Mac to terminate for cause if it suffered a "Critical Service Failure," *i.e.*, a disruption in its voice or data services for longer than sixty minutes. JA564, JA1091. The July outage certainly lasted longer than sixty minutes. Because it was caused by a random fire, however, the outage potentially triggered the force-majeure clause. The force-majeure clause excused events outside of CSC's control, unless CSC was at fault for the failure of the backups. JA571-72. Alternatively, the contract's savings clause prevented Freddie Mac

from terminating for cause based on a critical service failure that was its own fault. JA534-35. In short, Freddie Mac's fault was key.

And the backup failure was Freddie Mac's fault, according to CSC's evidence. As Harris's report thoroughly explained, Freddie Mac misconfigured its DNS server, which prevented the backup systems from communicating with the alternate data center. JA2282, JA2300, JA2302. Indeed, after CSC notified Freddie Mac of the problem, it reconfigured its DNS server to prevent the problem from reoccurring. JA2302.

The district court pointed to internal CSC documents suggesting that CSC was at fault for the backup failure. JA442-43. But those were preliminary assessments that a reasonable factfinder could ignore in light of Harris's later, exhaustive study. To be sure, Hilton sent emails in July 2015 that blamed CSC's systems for the "embarrassing" outage. But Hilton later testified that those emails represented his off-the-cuff assessment during "the heat of the [outage]," when he "wasn't aware of all the facts of the underlying issues and the culpability." JA2223-25. Moreover, his emails actually *support* Harris's conclusion: Hilton's main complaint about the CSC systems was that they "have massive dependencies on the client"—*i.e.*, they required Freddie Mac to act competently on its end. JA2223. It was Freddie Mac's incompetence, as the Harris report confirms, that caused the backup systems to fail.

The district court also cited an internal CSC document that blamed the backup failure on the absence of "a fail over back up circuit" and on "[c]onfiguration &

34

architectural flaws in CSC's UCaaS solution that precluded a complete fail over by means other than a circuit." JA1893. But the first issue was Freddie Mac's fault: it did not install a secondary circuit because it wanted the systems installed more quickly. JA2282, JA2299-300. And the other issue turned out to be Freddie Mac's fault too. As Harris explained, the reason the system did not "fail over" was because Freddie Mac misconfigured the DNS settings. JA2282, 2302. CSC's backup systems, which passed fourteen successful failover tests before the July outage, were not the problem. JA2300, 2302. Again, a reasonable factfinder could credit Harris's later study over CSC's initial assessment.

That is all CSC must show at this stage. "Where the party challenging the grant of summary judgment can 'show that the inferences they suggest are 'reasonable in light of the competing inferences,' summary judgment must be denied." *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 164 (4th Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are" not appropriate "on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Because the trier of fact "would not be required to believe" CSC's internal documents over Harris's report, *Edell & Assocs.*, 264 F.3d at 436, those documents do not establish that Freddie Mac is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

The district court knew that CSC blamed Freddie Mac for the outage, but it nonetheless asserted that "CSC musters no citations to the record in support of its claim that Freddie Mac's mishandling of DNS servers caused the breakdown." JA443. But CSC *did* cite evidence in the record—namely, Harris's report. *See* JA2016, JA347. The district court must have thought that Harris's report was outside the record because, five days earlier, it struck his report as a discovery sanction against CSC. JA425. Necessarily then, if the district court was wrong to strike Harris's report, it was wrong to grant summary judgment on CSC's claim for early termination fees and wind-down expenses.

It was wrong. In striking Harris's report, the district court abused its discretion because it did not consider the possibility of lesser sanctions. Indeed, the district court did not think it could award them. The district court stated that, unless a party can prove the "substantial justification" exception to Rule 37(c)(1), "the sanction *every time* is … to exclude the report." JA402 (emphasis added). "[T]hat's all I'm going to listen to," it warned CSC. JA402. The court later repeated that "the remedy, quite clearly, under the Fourth Circuit law is exclusion of the report." JA407.

That is incorrect. The text of Rule 37(c)(1) plainly allows the district court to impose sanctions short of exclusion, even when nondisclosure is not "substantially justified" or "harmless":

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless

the failure was substantially justified or is harmless. In addition to *or instead of* this sanction, the court, on motion and after giving an opportunity to be heard:

> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1) (emphasis added). Courts and scholars agree that "the plain text of the rule provides that … the court does have discretion to impose other, less drastic, sanctions." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006); *accord United States v. Rapanos*, 376 F.3d 629, 645 (6th Cir. 2004), *vacated on other grounds*, 547 U.S. 715 (2006); Wright & Miller, 8B *Fed. Prac. & Proc. Civ.* § 2289.1 (3d ed.).

Of course, district courts have discretion in choosing an appropriate sanction. But a court must "actually *exercise*[] its discretion" before this Court can "defer to its decision." *Sovereign Military Hospitaller Order v. Fla. Priory of the Knights Hospitallers*, 809 F.3d 1171, 1191 (11th Cir. 2015). "If the district court misunderstood the nature and extent of its [discretion]" because it assumed a particular sanction was "mandatory," its decision "is the product of legal error and thus constitutes an abuse of discretion." *McDonnell v. Miller Oil Co.*, 134 F.3d 638, 641 (4th Cir. 1998). A district court that "settle[s] on an exclusionary sanction as soon as the [expert-disclosure violation] was identified" and "ignor[es] the very possibility of less severe sanctions" commits "a clear abuse of discretion." *United States v. Johnson*, 228 F.3d 920, 926 (8th Cir. 2000).

The "best course" when this occurs "is to remand the case for the district court to reconsider" the appropriate sanction. *McDonnell*, 134 F.3d at 641; *accord Design Strategy*, 469 F.3d at 297-98 (holding that a district court that states "'preclusion is mandatory' under Rule 37(c)(1)" abuses its discretion and explaining that the "prefer[red]" course is to "remand[] the case to the district court to reconsider … the appropriate sanction").

Remand is doubly appropriate here because the district court's chosen sanction—excluding Harris's report—was fatal to CSC's claim. Exclusion under Rule 37(c)(1) is "particularly harsh" when "in practical terms, the sanction amount[s] to dismissal of a claim." *R&R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012). Thus, "the district court [i]s required" in these circumstances "to consider the availability of lesser sanctions." *Id.*; *accord Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 505 n.25 (4th Cir. 1977) ("Where any of the more severe sanctions (under Rule 37) is imposed, for example, it is reversible error to neglect to consider the milder sanctions."). Here, Harris's report was central to CSC's claim for early termination fees and wind-down expenses. Indeed, the district court stated that it granted summary judgment on this claim because it knew it was going to strike the report. *See* JA401 ("I will be honest with you, I took into consideration this motion to strike the report, and certainly considered that" in granting summary judgment against CSC.). Instead of dealing the fatal blow to CSC's claim, the district court had a duty to consider lesser sanctions—like ordering additional discovery, continuing the trial,

38

awarding costs and fees, or drawing an adverse inference. *See* Fed. R. Civ. P. 37(c)(1)(A)-(C).

Indeed, remand is triply appropriate because it is unlikely that the district court, once it actually exercises its discretion, would choose exclusion again. If it did, it would abuse its discretion. *See Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 156 (3d Cir. 1995) (explaining that "[n]otwithstanding Rule 37(c), the district court may be found to have abused its discretion if [its] exclusion of testimony results in fundamental unfairness"); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 616 (7th Cir. 2002) (explaining that "a judge's failure to impose a lighter sanction" under Rule 37(c) can be "an abuse of discretion even if the party could not show that missing the deadline was justified or harmless"). Based on what happened below, excluding Harris's report is plainly overkill.

Although Freddie Mac received Harris's final report after the deadline, it knew well in advance that the report was coming and that it would pin the backup failure on Freddie Mac. Harris blamed Freddie Mac for the backup failure in his initial reports, JA163, JA178; he warned Freddie Mac that his initial reports were preliminary and would be "supplement[ed]" after he finished reviewing the evidence, JA159, 174; and the parties acknowledged at his deposition that his final report was coming, JA2074. "[A]ny surprise" to Freddie Mac was therefore "minimal." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 193 (4th Cir. 2017); *accord Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000).

39

Moreover, between Harris's penultimate and final reports, Freddie Mac produced thousands of additional documents and the parties deposed six more witnesses. Based on this "subsequent production," Freddie Mac knew that Harris had a duty to update his report, Fed. R. Civ. P. 26(e), and that it would "take[] time for [him] to prepare h[is] updated analysis and make the additional revisions." *United States v. STABL, Inc.*, 800 F.3d 476, 488 (8th Cir. 2015).

Further, Freddie Mac received Harris's final report six weeks before trial—plenty of time to prepare a response or depose him a second time. *See Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 196 (4th Cir. 2003) (holding that 28 days was "ample opportunity to prepare for [late] witnesses and exhibits"); *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003) ("[A]ny prejudice was cured by the approximately one month during which [defendant] was allowed to examine and respond to the contested evidence."). If six weeks was not enough time, the district court could have "continued the trial to permit [Freddie Mac] to hire [its] own expert" or redepose Harris, instead of excluding his report altogether. *Johnson*, 228 F.3d at 926.

In short, all CSC did was file a supplemental report, six weeks before trial, from an expert it had already identified, after repeatedly warning Freddie Mac that it was coming. As the Eighth Circuit held under similar circumstances, this is not the sort of "egregious conduct" that warrants a sanction "result[ing] in a dismissal of one of [the plaintiff's] contract claims." *Dunning v. Bush*, 536 F.3d 879, 890 (8th Cir. 2008). This Court should remand to the district court with an instruction to choose a sanction

40

short of exclusion or, at a minimum, with an instruction to "exercise [the] discretion which the district court erroneously thought it did not possess." *United States v. Rogers*, 897 F.2d 134, 138 (4th Cir. 1990).

Harris's report aside, the district court offered one other reason why CSC is not entitled to early termination fees and wind-down expenses. In its reply brief below, Freddie Mac argued that CSC could not hold it responsible for the July outage because CSC never provided "prompt, reasonable notice of [Freddie Mac's] nonperformance," as required by the savings clause. JA535. The district court agreed in a single, conclusory sentence. JA443. This argument is deeply flawed.

For starters, CSC can prove a breach of contract without the savings clause. The force-majeure provision is sufficient to defeat Freddie Mac's claim that it terminated the contract for cause; the savings clause is just an alternative way to reach the same conclusion. As explained, Freddie Mac could not terminate for cause if the July outage fell under the force-majeure clause, and the force-majeure clause applied if the backup failure was not CSC's fault. Obviously, the backup failure was not CSC's fault if it was Freddie Mac's fault. Thus, Freddie Mac's fault is all that CSC needs to prove. The force-majeure clause does not require CSC to also prove that it gave notice of Freddie Mac's nonperformance. The only notice it requires is notice of the "Force Majeure Event" and the parties' efforts to solve it, JA572—notice that was indisputably provided here. JA2301.

Even under the savings clause, the district court should have denied summary judgment. Whether notice is "prompt" and "reasonable" depends on "the totality of circumstances." *Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 310 (2d Cir. 2016). It is "generally determined by the trier of fact" because it "depends on … the credibility of witnesses and the weight particular evidence will bear." *Id.* So too here.

A reasonable factfinder could conclude that CSC provided "prompt, reasonable notice" to Freddie Mac. At a meeting in September 2015, two months after the outage, CSC executives informed Freddie Mac that its DNS misconfiguration caused the critical service failure. JA2302. This notice was prompt: it came one month after Freddie Mac sent its termination notice—a notice that did not even explain *why* Freddie Mac was terminating. JA2232. Before then, CSC did not know what caused the backup failure and was working with Freddie Mac to figure it out. JA2301. Moreover, the DNS misconfiguration occurred on a server that Freddie Mac maintained; it is likely that Freddie Mac already knew about the DNS misconfiguration, and it would have been extremely difficult for CSC to discover this on its own. In fact, Freddie Mac made it impossible by refusing to give CSC access to its network. JA2237, JA2286. Based on all these facts, a reasonable factfinder could conclude that CSC provided reasonably prompt notice, that Freddie Mac frustrated its ability to do so, or both. *See, e.g.*, *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 202 & nn.17-18 (4th Cir. 2005).

42

## II.     The district court should have denied summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

Like it did with CSC's claim for breach of contract, the district court misapplied New York law when it entered summary judgment against CSC's claim for breach of the implied covenant of good faith and fair dealing. In New York, the implied covenant of good faith and fair dealing is "[i]mplicit in every contract." *Gutierrez v. Gov't Emps. Ins. Co.*, 25 N.Y.S.3d 625, 627 (App. Div. 2016). Thus, a breach of the implied covenant is a breach of the contract itself. *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011). The covenant "encompasses any promise that a reasonable promisee would understand to be included" in the contract. *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 949 N.Y.S.2d 115, 118 (App. Div. 2012). For example, parties reasonably expect each other "not to act arbitrarily or irrationally in exercising th[eir] discretion" under the contract. *African Diaspora Mar. Corp. v. Golden Gate Yacht Club*, 968 N.Y.S.2d 459, 465 (App. Div. 2013). Parties also reasonably expect each other not to "do anything [that] will have the effect of destroying or injuring the[ir] right … to receive the fruit of the contract." *Gutierrez*, 136 A.D.3d at 976.

Here, CSC has identified numerous actions that breached the implied covenant of good faith and fair dealing. As mentioned earlier, Freddie Mac rejected change orders arbitrarily and in bad faith. *See supra* I.A.2. Freddie Mac also sabotaged CSC's performance at every turn. As reflected in the "Lessons Learned" presentation, Freddie Mac refused to relinquish control over its systems, and it put its employees in

43

positions of authority over CSC. JA2370, JA2372. Because those employees were not well-trained, policies were changed and violated on a regular basis. JA2370. Witnesses also testified that Freddie Mac demanded CSC perform on artificially tight deadlines, while Freddie Mac dragged its heels when providing information or approving requests from CSC. JA2374, JA2213, JA2217-18, JA2284-85, JA164-67. All of this conduct violated the implied covenant of good faith and fair dealing. *See Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230-31 (2d Cir. 1991) ("rejection of [business] propos[als]" and "abrupt and unexplained decisions to reverse … policies"); *O.K. Petroleum v. Travelers Indem. Co.*, No. 09-cv-10273, 2010 WL 2813804, at *4 (S.D.N.Y. July 15, 2010) ("inadequate[] investigat[ions]" and "inordinate[] delay[s]"). And it not only required CSC to expend more time, resources, and manpower than should have been necessary, but it also soured the relationship to the point that Freddie Mac terminated the contract.

The district court was wrong to characterize these allegations as "conclusory." JA448-49. They are amply supported by the documents, declarations, and depositions that CSC cited. The district court might not have *believed* CSC's evidence, but "[w]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the … finder of fact." *Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-cv-2949, 2017 WL 818364, at *19 (E.D.N.Y. Mar. 1, 2017)

(quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007)).

The district court also was wrong to classify some of CSC's allegations as "duplicative" of the breach-of-contract claim. JA448-50. "Two claims are duplicative" only if they "arise from the same facts … and do not allege distinct damages." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008). The facts and damages must be exactly the same: claims are not duplicative just because their factual allegations "overlap." *Rosa v. TCC Commc'ns, Inc.*, No. 15-cv-1665, 2016 WL 67729, at *3 (S.D.N.Y. Jan. 5, 2016); *JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., Inc.*, 997 N.Y.S.2d 270, 287 (Sup. Ct. 2014).

For "a breach of contract claim and a bad faith claim," the "test for duplication … is whether 'the [alleged] wrongful conduct was "also the predicate for a claim for breach of covenant of an *express* provision of the underlying contract."'" *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, No. 09-cv-853, 2017 WL 743996, at *5 (N.D.N.Y. Feb. 24, 2017); *accord O.K. Petroleum v. Travelers Indem. Co.*, No. 09-cv-10273, 2010 WL 2813804, at *3 (S.D.N.Y. July 15, 2010). If the allegations "fail to identify an express provision of the contract which defendants have breached," then the "good-faith claim is not redundant." *Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-6551, 2014 WL 4058321, at *7 (S.D.N.Y. Aug. 15, 2014).[5]

---

[5] The district court's observation that an implied-covenant claim "is almost always treated as … duplicative of a breach of contract claim," JA446, is demonstrably

Under this standard, CSC's implied-covenant claim is not duplicative of its breach-of-contract claim. As the district court acknowledged, most of CSC's factual allegations—foot-dragging, micromanaging, unreasonable deadlines, and morphing obligations—were not duplicative. JA449. These allegations do not implicate any express provision of the contract, and they involve different facts from CSC's breach-of-contract claim. They also seek different damages. *See Gutierrez*, 25 N.Y.S.3d at 627-28 (breach of the implied covenant entitles the plaintiff to "consequential damages, which … may include loss of earnings").

True, the allegation that Freddie Mac unreasonably denied change orders has some factual overlap with the allegation that Freddie Mac failed to pay Invoices 25 and 34-52. But the claims are not identical. The contract claim rests on Freddie Mac's express obligation to pay invoices, while the implied-covenant claim rests on Freddie Mac's implied obligation to review change orders in good faith. No express provision of the contract limits Freddie Mac's right to deny change orders, as Freddie Mac

---

false. Courts frequently hold that implied-covenant claims are not duplicative. *See, e.g.,* *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183, 195 (E.D.N.Y. 2014); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, No. 09-cv-853, 2017 WL 743996, at *5 (N.D.N.Y. Feb. 24, 2017); *Rosa v. TCC Commc'ns, Inc.*, No. 15-cv-1665, 2016 WL 67729, at *3 (S.D.N.Y. Jan. 5, 2016); *Mbody*, 2014 WL 4058321, at *7; *Ret. Bd. of Policemen's Annuity & Ben. Fund of Chicago v. Bank of N.Y. Mellon*, No. 11-cv-5459, 2014 WL 3858469, at *3-4 (S.D.N.Y. July 30, 2014); *Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12-cv-6792, 2014 WL 113745, at *48 (S.D.N.Y. Jan. 13, 2014), *aff'd*, 614 F. App'x 523 (2d Cir. 2015); *Credit Agricole Corp. v. BDC Fin., LLC*, 22 N.Y.S.3d 847, 847-48 (App. Div. 2016); *Gutierrez*, 25 N.Y.S.3d at 627; *JJM Delta Dallas Alpha Corp. v. S. St. Seaport Ltd. P'ship*, 4 N.Y.S.3d 510, 510 (App. Div. 2015); *Hong Leong Fin. Ltd. (Singapore) v. Stanley*, 13 N.Y.S.3d 832, 833 (App. Div. 2015).

concedes. JA471. That obligation is implied by the covenant of good faith and fair dealing. *See Peacock*, 889 N.Y.S.2d at 24. Breaching that obligation is thus not duplicative with breaching the contract. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, No. 09-cv-853, 2017 WL 743996, at *5 (N.D.N.Y. Feb. 24, 2017) (holding that a claim for "failure to pay amounts billed" and a claim for "alleged improper claims handling" were not duplicative).

The allegations about Freddie Mac's termination of the contract are not duplicative either. *See One Source Envtl., LLC v. M+W Zander, Inc.*, 13 F. Supp. 3d 350, 362 (D. Vt. 2014). CSC's breach-of-contract claim alleges that Freddie Mac violated the provision that requires it to pay early termination fees and wind-down expenses, not the provisions that govern termination. CSC's implied-covenant claim alleges that, although Freddie Mac had the right to terminate for convenience, it asserted the right to terminate for cause. And it did so in bad faith: Freddie Mac was not affected by the outage, which occurred over the holiday weekend. Freddie Mac instead invoked the outage as an excuse to get out of the contract, and it did so to enjoy the benefits of CSC's services without the burdens of paying for them. *See Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112-13 (2d Cir. 1985). A reasonable factfinder could infer Freddie Mac's bad faith from its internal emails before the outage, where Lux was searching for "options" to enact his "preference … to pay [CSC] nothing for implementation." JA2379. A reasonable factfinder also could look at the "timing" of the emails and the

termination—soon after CSC finished modernizing the network—to infer bad faith. *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 235 (S.D.N.Y. 2013).

The district court read Lux's emails to mean that he only wanted to "pay [CSC] nothing … till they fix our issues." JA449. But this is another example of the district court weighing the evidence itself instead of viewing it in the light most favorable to CSC. Lux's email states: "My obvious preference is to pay them nothing for implementation and to pay nothing for ongoing operations till they fix our issues." JA2379. A reasonable factfinder could conclude that the phrase "till they fix our issues" does not modify "pay them nothing for implementation," only "pay nothing for ongoing operations." (Grammatically, that is the better reading given the repetition of "to pay nothing for.") Under that view, the trier of fact could infer bad faith because Freddie Mac had a category of charges it refused to pay and a motive to get out of the contract. The district court also emphasized an earlier email from Lux that stated, "I don't think CSC provided a reasonable level of service." JA449, 2379. But a reasonable factfinder could view this as evidence of bad faith. Lux's justification for wanting out of the contract (the quality of CSC's services) is different from the one that CSC later invoked (a critical service failure). And, as CSC has alleged, the quality of its services was diminished precisely because of Freddie Mac's bad behavior throughout the contract. Again, these are all questions for the trier of fact.

At one point, the district court suggested that CSC's implied-covenant claim was duplicative because, during discovery, CSC gave similar answers to Interrogatories

13 and 6. JA447-48. Interrogatory 13 asked CSC to explain the factual basis for its implied-covenant claim, and Interrogatory 6 asked CSC to explain why "Freddie Mac's conduct in performing or failing to perform under [the contract] was the product of gross negligence, willful misconduct, or fraud." JA1952, JA1947. It is unclear what role, if any, this observation played in the district court's decision, but it is a red herring.

That CSC gave similar answers to Interrogatories 13 and 6 is unsurprising; the facts that prove bad faith also tend to prove "gross negligence, willful misconduct, or fraud." But there is no duplication because gross negligence, willful misconduct, or fraud are not a "basis for breach of contract," as the district court assumed. JA447. All that the contract says about the torts of "gross negligence, willful misconduct, or fraud" is that they are not subject to its damages caps. *See* JA570. Moreover, any duplication was due to the way that Freddie Mac framed the interrogatories. Interrogatory 6 asked about "Freddie Mac's conduct in *performing*" under the contract, JA1947 (emphasis added), which could include conduct covered by the implied covenant of good faith and fair dealing. *See African Diaspora*, 968 N.Y.S.2d at 465. CSC cannot be blamed for covering all its bases in response to this confusing interrogatory.

One final point. Under the Federal Rules, plaintiffs can bring inconsistent, alternative claims. Fed. R. Civ. P. 8(d). CSC is thus free to argue that Freddie Mac's conduct *either* violated an express provision of the contract *or* violated the implied covenant of good faith and fair dealing. *See Broin & Assocs., Inc. v. Genencor Int'l, Inc.*,

49

232 F.R.D. 335, 339-40 (D.S.D. 2005). It did that below. Accordingly, if this Court concludes that some of Freddie Mac's conduct did not violate an express term of the contract, it still must assess whether that conduct violated the implied covenant. The implied-covenant claim cannot possibly be duplicative in that scenario. *See In re Montagne*, No. 08-10916, 2010 WL 1780411, at *7 (Bankr. D. Vt. May 4, 2010) ("[G]rant[ing] [a] motion for summary judgment" because a party's conduct did not breach "an express term of the contract" means that the claim "for breach of the implied covenant on these grounds is not duplicative."); *Mbody*, 2014 WL 4058321, at *7 (same). The district court appreciated this principle at the motion-to-dismiss stage, when it rejected Freddie Mac's duplication argument and allowed all of CSC's claims to go forward. It should have adhered to that ruling.

## CONCLUSION

For all these reasons, the Court should reverse the district court and remand for further proceedings.

May 22, 2017                              Respectfully submitted,

                                          /s/ William S. Consovoy

Steve Sumner                              William S. Consovoy
David Schick                              Bryan K. Weir
Justin Sumner                             CONSOVOY MCCARTHY PARK PLLC
Gayle Boone                               3033 Wilson Blvd., Suite 70
SUMNER SCHICK & PACE LLP                  Arlington, VA 22201
3811 Turtle Creek Blvd., Suite 600        (703) 243-9423
Dallas, TX 75219                          will@consovoymccarthy.com
(214) 965-9229                            bryan@consovoymccarthy.com
ssumner@sumnerschick.com
dschick@sumnerschick.com
jsumner@sumnerschick.com
gboone@sumnerschick.com

                    *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because it contains 12,975 words, excluding the parts exempted by Rule 32(f).

This brief complies with the typeface and typestyle requirements because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.

May 22, 2017                                    /s/ William S. Consovoy

## CERTIFICATE OF SERVICE

I certify that on May 22, 2017, this document was served on all parties or their counsel of record through the CM/ECF system.  A copy of the sealed brief was sent via third party commercial carrier to all counsel of record for delivery within three days.


May 22, 2017                                            /s/ William S. Consovoy